This morning is Beatriz Ball v. Barbagallo Company, No. 21-30029. We'll hear from Ms. Brough. Good morning, Your Honor. Your Honors. It's the day for exhibits. It is the day for exhibits. I'd like to start this morning by thanking the Court for the opportunity to be here for oral argument. This case is about whether or not a designer with many years of experience, many years of acclaim, many years of winning awards in the high-end tableware and gift industry market can protect her designs against copying based on two things. Copyright registrations that were issued in the name of the DBA of her designs in the marketplace. I took to heart the instructions from the Court about oral argument. We have multiple factor tests to deal with here. In this argument, I want to focus on two issues. One is the copyright standing, and second, on the trade dress and the strength of the trade dress. I want to focus on the clearly erroneous standard and why the errors that we have pointed out in our brief require reversal by this Court. Of course, I'm here to answer any questions that the Court may have. On copyright standing, we start with the statute. The statute is pretty clear. Congress has adopted a very forgiving standard. The whole point on copyright standing, isn't it correct, is whether, because I'm very interested in the trade dress argument, is how we interpret this assignment. And if the assignment is interpreted, it has no temporal limitation, and therefore it ought to include all claims past, present, whatever. Correct. In fact, it would be nonsense if it didn't include all things that preexisted it. Which is exactly the ruling that was made in Hacienda Records. I speak only for myself, not for my colleagues, but that seems to me the most straightforward way to approach it. Can I ask you, though, you didn't cite Prather. Can you explain that case? Prather is a 1969 case written by Judge Brown at a time when I don't think the courts were particularly careful about asking what law do we apply to a contract that involves copyrights. And citing another circuit's case, the Court decided that the copyright assignment at issue there did not transfer back to the publisher the causes of action for past infringement. And it looked to, and I have it here because it's really rather fascinating, it cited a 1941 case to answer that question and essentially come up with a federal rule, okay, that we prefer. It doesn't say it's a federal issue, though, right? It didn't even say that. It's silent on that. It's a patentless case from the 1890s and a patent case from the 1860s. Yeah, but this notion that we should think it was a bad opinion is irrelevant to me because we're bound by precedent unless something has changed, unless you're saying the statute's change is significant, unless there's an en banc or U.S. Supreme Court decision, so on and so forth. So let's assume Argumento Prather still governs. How did you all meet that? Do you believe you met the standard there, even if you don't like it? Absolutely. Okay, tell me. And I can tell you why, because all you have to do is look to the ruling in Hacienda Records. In Hacienda, there were two assignments, both to the recording artist's lawyer. The first assignment was for a half interest. The second assignment was an interest of any and all rights to enforce the copyrights. The recording artist in that lawsuit was saying, wait a minute, we only intended to give the lawyer future rights, and the court went through the Prather analysis, and this is their rulings. Certainly, the appellant, the recording artist's copyrights are included in the inclusive term, any and all, that the attorney alone was given the exclusive right to enforce. It would be nonsensical to interpret all rights to mean all rights except those rights related to prior copyright infringements. And then, here's the killer, therefore, the broad and inclusive language in the assignments and special powers of attorney created before this action were sufficient under Prather. There is no, Prather doesn't require magic words. In Hacienda Records, the same terms that were used in the assignment at issue here, any and all, and I'm kicking myself, my brief, I just think of it as an all rights assignment. But the specific language is any and all includes causes of action for past infringement. Isn't it correct that the first time they brought this up was in closing argument to Judge Vitter? That's correct. Our briefing in the lower court was scant on this. The only other remark I will make on the question of standing is that for future infringements, we have ongoing infringements. They were alleged, and they were shown at trial. If there's any problem with past infringement, you still have your causes of action for the conduct after the date of the assignment, which is October 30, 2018. On trade dress, I can sum up the errors of the district court in two words. And those two words are Inwood Labs. Inwood Labs was a case that was supposed to be about vicarious liability for selling generics as branded drugs. Instead, it turned into a case that was overwhelmingly about the standard of review. And here's what the court said. If a trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard. Inwood Labs is also important because it gives us the definition of what is secondary meaning. That's the whole issue here. Judge, the district court said, I don't find secondary meaning. What is secondary meaning? Secondary meaning, according to Inwood Labs, asks if the primary significance of a product feature is to identify the source of the product rather than the product itself. This court sometimes uses the expression, I think it's a little more comely, consumer association. Let me ask the counsel about this clear error review. You know, do we go through each, I think it's seven factors, and say, well, did she make a mistake here, did she make a mistake here? Or do we look at the, you know, the conclusion is no secondary meaning. Do we look at that and say, was that in clear error? The opinions of this court have gone through the seven factors. And I think that's appropriate because you don't have to win them all. You don't have to bat a thousand to establish secondary meaning. It's a little odd to me is if this were a jury trial, the jury would have just said, no, we find for the defendant on trade dress, and we'd review that as long as the evidence supports. I mean, a bench trial, because she writes all this stuff in a lengthy, thorough order, it's in a way subject to more review. That's not really your problem, that's just more an observation. So you do think, I mean, if we think one factor, what if we think she just got one factor wrong, which would still mean the majority go in favor of the defense, could we then look at it overall and still say, in our view, whether there's secondary meaning? This court certainly has the authority to do that. It's not what we asked for. We asked for remand because there's so much else to go through, and because of the remark made in the opinion itself, which is, you know, on the basis of factor one, which is a very long length of time. What would we remand for in regard to trade dress? In regard to trade dress, we still have test number two, which is likelihood of confusion. Well, I guess my thing is, if we think she got one wrong, would she have to reweigh, or could we do the overall weighing? I mean, theoretically, you could remand and say the fact finder has to reweigh, given that it's now, you know, three versus four instead of, you know, one versus six or whatever. As I said, this court, Judge Costa, this court has the power to review the seven factors, review the evidence that is of record, and make its own determination. Sometimes that is done, and sometimes it's remanded. The only case that I can think of where this court rendered, you know, decided a ruling, was it's not even in our brief because it's not really relevant, is the Elvis case. There was a restaurant called themselves the Velvet Elvis. I went there back in the day. And there was Elvis Presley Enterprises, you know, sued. They won some and they lost some, and they brought an appeal on the items that they lost, which was the actual name, the Velvet Elvis. And this court went ahead and decided those issues and changed them from a loss for Elvis Presley Enterprises to a victory and granted the relief. That was a pretty extraordinary circumstance because you already had a, you know, partial decision on the whole merits. What are we supposed to learn from this stuff that's to your left? Ah. Well, part of that, I brought these today to show the court what we're talking about, that there are discernible design elements in these products. They're very specifically defined, and one of the errors that, and I think it's one of the most significant errors made in the district court, was the failure to look at the trade dress in its totality. That what we're talking about- Those aren't all Beatrice Balls, though. Which is Beatrice, the gold is Barbara Gallo. The gold is Barbara Gallo. For a point of comparison, I brought a Mariposa Ball, which is, you know, there are, you know, don't, we were all instructed to take our exhibits home. This is a typical Mariposa design. It's in a standard shape, perfectly round. There is no undulation in the rim, and the beading is of uniform side. It looks like, they look like balls or ball bearings. It looks like a revere ball with dots on, with pearls on top. Correct. This is, the other two examples that I brought, this is exhibit 31, which is the triple dip bowl, and this is the Pampa Bay copy of the triple dip. So the, I mean, the big difference, I mean, aside from the design differences, am I correct that since Pampa Bay is a ceramic base, you can throw it on the floor and break it? And it sells for, if it sells at Hobby Lobby, it's not catering to the same consumers, right? It began at Hobby Lobby, Your Honor, but it then moved into the same market, the same high-end marketplace as our client. So Neiman Marcus sells Pampa Bay? Not Neiman Marcus, but the jewelry stores and the gift ware stores. Macy's? Not Macy's, that I'm aware of. But they're in the same jewelry stores, the same gift stores as this. Not Bonnie's. Are the prices comparable, or are they? They are not. It's a lower price knockoff. So in the district court, you know, on factor after factor, the purpose of looking for consumer association, that's the trade dress, the secondary meaning, the district court only reduced the trade dress to fewer than all of its elements. That's clear error. Our obligation here is not to show that we are, our burden is to show that all the elements of the Beatrice Ball trade dress, the odd shape, the odd shaped beads, the different size in the beads, the hammering of the surface, that all of those elements are associated in the consumer mind with Beatrice Ball. They demonstrably are because people call up Beatrice Ball's trade representatives and ask to order this. Her trade reps were up in arms at the first trade show, the first market when this came out, thinking that Beatrice Ball had launched a low-cost line. So when you have a district court that says, well, your advertising isn't good because you put Beatrice Ball's name on it, that subverts inward labs because how else is someone supposed to understand that this is your product? I'm out of time, Your Honors. When you get back, we may cover it with the opposing counsel, but I'd like to know exactly what's the difference between trade dress and copyright in this case, and what, if anything, well, just what's the difference? Okay. Thank you. Thank you, Your Honor. Mr. Whitfield. Good morning, Your Honors. May it please the Court. Beginning first with the copyright claims, as the Court is aware the alleged errors on appeal all relate to the copyright assignment itself. However, it's important for the Court, I think, to understand there are at least two glaring errors and defects in connection with the copyright claims that are apparent on the face of the record. So first and foremost, the record on appeal shows that the plaintiff cannot prove legal ownership of these copyrighted works. So even if the Court should decide it wants to reverse the precedent existing in the Fifth Circuit with regard to copyright assignments and finds that that copyright assignment is now valid and effective, the plaintiff is still unable to establish standing because it cannot prove ownership. Because of the DBA? No. Because of the fact that all of their pleadings, all of our admissions in their pleadings, all of their trial testimony clearly, repeatedly, consistently established that each and all of these copyrighted works were handcrafted by skilled artisans in Mexico. You know what? If this was a no, wait, you're talking about you're not talking about the assignment, right? I'm not talking about the assignment whatsoever. I'm talking about ownership of a copyrighted work under Federal copyright law. But if you come up with a design, you're going to have workers actually do the manufacturing. Well, you might come up with a design. Who created the sculpture work on each of these? Did you raise that in the District Court? Absolutely. And it's in the face of the record. It doesn't even matter. Did you brief that in this Court? I have briefed it in this Court, Your Honor, yes. And they have addressed it in the reply brief, which I can address. Okay. So this has all been briefed. It is on the face of the record. These are admissions and it's established by trial testimony. There is no doubt. But Judge Fitter didn't rule on that. She didn't have to rule on it. I guess she took the easiest, it's pretty easiest to apply the Fifth Circuit President from Prather to say that copyright assignment, as simple as it is, it's only a few lines, does not meet the standards established in the Fifth Circuit. Well, suppose she's wrong on that. If she's wrong on that, it still can't win because they can't establish ownership. And that's what I'm talking about right now. Because these works were created by these individual skilled artisans, there is no assignment in the record from any of these individuals. You know what? I bought Camper pottery for decades. And Camper is manufactured in France. It's been going on since the 16th or 17th century. And every artisan signs each piece of pottery. But that doesn't mean the artisans had the copyright on it. It may not. No, it probably doesn't. They just sign it and it's who created it. Who's the author of that work? I don't see how you can challenge her standing unless you had evidence as to their requesting a copyright. I do have. I don't have evidence. Their requesting copyrights. And she had to gain an assignment of their copyrights. Well, first off, it's their burden of proof on copyright ownership. There's only four copyright registration certificates. On those four copyright registrations, the plaintiff in this case is not identified as an author or a claimant. If you stop right there, how do they get into federal court? They cannot. So they allege, as one of their errors, and I'll get to the assignment later, that it was an error for the court to require it. The court did not require a copyright assignment. I have a copyright. If I'm an author and I have a copyright, if someone else publishes my book, that person can gain my authority to publish that book, right? If you sign something allowing them to. I think you're raising a whole host of red herring issues here. I would say just the opposite, Your Honor, with due respect. The copyright assignment is a bit of a red herring to me in this case because what I'm talking about is facts established on the record. There's no way around this. But Judge Vitter's opinion doesn't even allude to this aspect of your problem. The court can correct me if I'm wrong, but I feel that the court of appeal has an obligation, if there is established facts in the record, that would obviate the need or the requirement or make a remand back to the district court unworkable or unnecessary as a matter of law because other evidence in the record shows they cannot prove ownership. This is their evidence in the record. They submitted it. But what they're doing is they are designing things according to what Ms. Ball told them to do. That's the same thing with any – I may not agree myself with this law, Your Honor. I don't like the fact that a photographer owns my wedding photos, even if I show up and say, there's the way I want my photos. I want my daughter over here. I want my kid. I want to do this. I don't like the fact that I can go to a computer programmer and tell him everything I want for a software product to create a will. I tell him I want it to do this. These are the flow charts. But the copyright is going to be owned by that software programmer who writes the code, who makes that software work. That's the law, even if I don't like it. What's your case that you're relying on for that? The law is clear under the Supreme Court's decision in Community for Creative Nonviolence v. Reed. Who's the author of these works? The law is clear. And I would ask the Court, please, look at Exhibit. If there's any doubt in the Court's mind, you have to – this Court has to establish who's the owner of these works. It has to be done. It's not established on the copyright registrations. Secondly, I would ask the Court to look at Plaintiffs' Exhibit 40, which is a short video created by the plaintiffs and submitted into evidence. It shows how these skilled artisans in Mexico are handcrafting and making and creating these sculptural works. I have no doubt that once you look at that video, you look at it and consider it in light of all the admissions of the plaintiff in their own pleadings and their own trial testimony as to who made these works, the Court will decide under the Supreme Court's decision in Community for Creative Nonviolence. But if I worked for your wedding photographer and I took the pictures at your wedding, wouldn't the wedding photographer still own the copyright, even though I'm the one who took the pictures because I'm their employee? That's correct. Okay. So these skilled workers in Mexico, aren't they working for Beatriz Ball? There is no testimony in the records as to who these people are employed by. Are they employed by Beatriz Ball? There is no testimony to that fact in the records saying who they are. They have identified, and it's in the record before the Court, they don't identify these as works made for hire. They have said, and I pointed out in my brief, even to this day on new copyright registrations, all of their current and new copyright registrations are wrong, in my opinion, because they are still to this day not identifying any of these as work made for hire. Under the work made for hire doctrine, if your employee creates something in the line and of course the scope of his business, the employer, by law, owns that copyright. And there's just a little box you check on that one form, simple form, front and back, one page. Is this a work made for hire? Yes. You check that box. That's how you show that you're employees. I have an excerpt from NMR here. It says the originator addressing this issue rather than the fixer should be deemed the author. And we have a case, Lake Dreams v. Taylor. Are you familiar with that case that addresses this issue? I'm not familiar with it. It says authors retain copyright protection for their designs even if they do not transpose the design into the physical form that's distributed to the public. So that's this case. That would be, under the law, again, copyright is only an enumeration of like five rights, and I think it's under Section, I get the number wrong, 105 of the statute. But it only tells you here's what you can do. And one of those rights is the right to create a derivative work. So if I create a book, I own the right for somebody else to create a screenplay, turn it into a movie, whatever. They've got to come for me. That's a derivative work. Only I can create a derivative work or license them to create a derivative work. So under the derivative works doctrine, yes, I would agree that only that person can change it or design it. But what is the evidence to show they say, I'm taking them at their word, their evidence is that these individuals, these skilled artisans, and I've looked at their exhibits, and they say they created these sculptural works. There's no evidence in the record to show that Ms. Ball was the sculptor who created these sculptural works. I see in the record. It's not unique, right? I mean, take one of those. I mean, there's hundreds or thousands that look just like that out in the marketplace. That's correct. You could tell any designer I want a round bowl with beaded trim around it and make it organic and in regular shape, and it's done. They don't need to see that. Each Beatrice Ball piece is not different. There's a design, and then there's – I can go into the Macy's today, and there's 20 of them on the shelves, right? No, because they don't sell at cheap places like Macy's. At some of the stores, yeah. I mean, there's a different price because they're a different product. Only you know those stores, Jeff. No, the people who were generous in giving me wedding presents, and I've been generous in giving wedding presents for many years. I didn't – This issue was nowhere in the – you're right that technically we can affirm on alternative grounds, but it just seems a little strange that you don't – you're focused on this argument when, I mean, the judge found for you. Yeah, how come you didn't – You don't agree with what she said. Because it was established in the record. I don't know why – You could have moved for summary judgment. I could have. Yeah, you could have. So why did you waste, what, seven days in trial? Well, because I did file a motion for summary judgment. I thought I should have been granted – I mean, you know, a lot of us cut our teeth on what I could have done if I had thought about it in time. So why don't we move on? What about the – she said the contractual language was – Yeah, if you look at – they talk about Louisiana laws being one of the errors of assignment on appeal, that Louisiana law is pretty straightforward. It's just like Texas law, where the Hacienda case came from. It's the four corners doctrine. You look at the document and you interpret it exactly as it reads. That's what the judge did. She looked at it and said, is there any kind of – the judge first found, after looking at all the evidence, that all of these acts of infringement had occurred and were accrued as of the date of the assignment or before. And she looked at that to see, are there any under Prather and under the Hacienda case? Has there been any form of assignment whatsoever of these accrued existing causes of action? And the court found, clearly, that's not in the assignment. So under Louisiana law, the four corners doctrine, she applied what was written there and found that they did not include those separate causes of action, so the plaintiff had no standing under the copyright – under that copyright assignment. Why don't you move on to trade dress? I want to just also point out, too – Because I don't think you'd be emphasizing copyright so heavily unless you feared reversal on that. So move on. Trade dress? Yes, Your Honor. I'm not telling you what to say. No, I'm happy to do it, and it's about at the time, halfway through my presentation anyway. So in this case, I think it's important to remember that the plaintiff is claiming trade dress and product designs. The Supreme Court has already very thoroughly expressed its extreme skepticism for people claiming trade dress and product designs, and that's why in Samir Brothers they said that trade dress and product designs are inherently incapable of serving as a sole source of origin, and therefore the plaintiffs in those cases are first required to prove secondary meaning. And in the Fifth Circuit and other circuits, the burden of demonstrating secondary meaning is substantial and requires a high degree of proof. Well, let me ask you about – I mean, I know the other side raises what she considers to be errors of law in each of these factors, and I'm not sure we have time to go over those. But as a longtime consumer of these kinds of goods, I actually didn't know about Beatrice Ball. But having read the evidence in the record, it seems to me that what you're dealing with is someone who is somewhat equivalent to Chanel or Louis Vuitton or Hartman in terms of luggage, all of which have distinctive designs that the astute consumer in the astute market associates with those designs. And it reminds me of my friend who came back from Hong Kong with this watch that looked for all the world like a Rolex except when you looked at the R it was a P. So the trade dress of Rolex is something. Why isn't this like those other articles? Well, again, first off, you have to have a secondary meaning unlike other trade dress. I understand that. It's unusual. Trade dress and product designs are extremely unusual, and it's a very high standard. So that's the biggest problem, I think, but in this case. But when you look at all of these, again, you're right. The seven-factor analysis for secondary meaning, it's supposed to be looked at from the view of the consumer. Would the consumer look at that product and say that comes from Beatrice Ball or some individual manufacturer? And I can look at it and tell that because it's the sole source of origin for that product, and it is associated with one person. In this case, the courtroom that we had this trial in was stacked full of products all around the courtroom, the plaintiff's products, the defendant's products, products of other manufacturers. There were hundreds of pictures that the judge looked at. But they all post-dated when she developed her design, Organic Pearl, right, including your client. Well, perhaps only because of the fact that when I was looking at evidence, I couldn't go back several years and find, you know, old documents or something like that. I agree it might be something if you were talking about plain white china plates, maybe even with a titanium edge on them or something. But these, when you look, this reminded me of the Nambe pottery, for instance, or the Armitauld designs. And when you go into a store, you look at the pewter, you look at the finish, and you know what they are. And the astute person knows, and I'll bet you they're, are they displayed in the stores as Beatrice Ball Collection or Beatrice Ball Organic Pearl? Absolutely. All of these collections, that's another thing that we pointed out and came out at trial. You don't just walk in and see a bowl sitting on a shelf. Each of these are set, there's placards and there's signs saying Beatrice Ball. Our products say, have it even a slogan saying, I can't believe it's not porcelain because it's ceramic. And that's his big thing. He's pushing. He's letting them know, this is a ceramic product. It's something that you can dishwasher, you can wash it in the dishwasher, you can put it in the oven. It's a cheap, it's a knockoff, and it'll break if you drop it. It's a cheaper price. It's a completely different product. It's not aluminum. You weigh them, you can feel the difference. You drop our product, it's going to probably break if you drop it wrong. Their product's going to clang very loudly. It's a very heavy, their aluminum product's very heavy. Completely different. But there are signage all around the products obviously telling you, what are you looking at? What is this product? They're all labeled, Beatrice Ball are labeled with my company, Pampa Bay. Well, that goes to confusion really I think. It goes to confusion, that's correct. The likelihood of a possibility of confusion when they're all labeled and identified. Let me go over a few things that concern me about the way some of these factors were treated. Okay. Factor two, sales. Over 6 million. They point to a document that has something of wedding gift registry publication that comes out that's specifically referred to apparently organic pearl. So Judge Fitter sort of erred in that regard, right? Well, that's a good point because there's no evidence in this record about advertising relating to the trade dress. The best example I can think of for trade dress is. I'm not saying ads. I was talking about factor number two, sales, related to this. Correct. I'm sorry, Your Honor. You're correct. You're right. I think the judge did err in saying that, oh, your sales. And I don't know how she did this because I thought it was a pretty clear trial. Their sales showed their product line for these products. And it looks like the judge found in her finding that they didn't produce just the specific product line sales. They did the whole sales. Well, they didn't. But I will say this. What is it about those sales figures that anybody can say had to do anything with the trade dress? How do they know they didn't just want to buy a bowl? How do we know that? Because people who are going to buy a bowl, I'm telling you as a consumer, I'm sorry. But if I want a bowl that looks like handmade with these little things on it, I'm going to be drawn to that bowl instead of the Revere bowl. Or the NAMBE bowl. But you may just need a bowl for a party. These are functional items. Excuse me. Excuse me. These are wedding gift items. These are not the things you just walk into Hobby Lobby and buy for $10. But moving on. I'm sorry. Ads. She said they say it's error to exclude group ads, that apparently Organic Pearl is not distinguished from other of the Beatrice Ball products in the ads. Is that correct or not correct? It's not correct. I would say, Your Honor, the Court has to look at the actual evidence and look at the ads that they had. It was no surprise to me, I will tell you. I remember, Your Honor, when this trial, when this claim was first filed, the name of the plaintiff was Fabulous Pewterware. It's no surprise to me that halfway through the litigation they changed the name of the company to Beatrice Ball, LLC. Because all of the marketing, all of the advertising is about Ms. Ball. If you go look at it, it's in the evidence. It's about her. It's about Beatrice Ball. And so they changed the name. But how many ads did you see where they draw any attention to the actual trade dress, the way a McDonald's does when they say, see, follow the arches, and you know. Well, if you're looking for silver, you do tend to look for certain patterns. Certain patterns are historically, like repoussé, is historically associated with one silver manufacturer. Colonial designs are more closely associated with other manufacturers. I mean, that's the way it is. That may be the way it is, but the law, and we've cited the- Well, that's what the law takes account of. Well, let's move on to direct consumer testimony. You said there's no proof of consumer, let's see, I have to read my notes, but- There's no, neither one of those factors. This Fifth Circuit has found that the two most important factors in the analysis are direct consumer evidence, direct consumer testimony, if you will, and consumer survey evidence. In this case, clearly they did not provide either one of those. And it's interesting to note that the record also shows where the plaintiffs, some of the biggest customers are. They have a number of customers based, a large number based in Louisiana, a significant amount based in New Orleans. They could have called any one of these store owners, customers, to the trial at this matter in New Orleans. They did not present any evidence, even though this is one of the most significant factors, because the secondary analysis test is viewed from the perspective of the consumer. They have no evidence from what the consumer views, how it would view this as the sole source of origin for these products. Okay, thank you. Thank you, Judge. Okay, Ms. Brough. Thank you. I'm happy to remove this. Let me quickly address the question of authorship. In our brief, we asked the court not even to reach the issue because there wasn't a cross appeal. I hope I'm wrong on that. I hope you reach it because that is an argument that needs the vampire treatment. It needs a stake driven through it. It needs to be put in a coffin and put away. The determining factor of authorship is direction. And it doesn't matter who is manipulating the beads, who is pouring the metal. If it's under the direction, if it's the vision, if it's the design of Beatrice Ball, she is the author. We cite Lake Dreams, which were two families who couldn't draw to save their lives, but they came up with T-shirt designs by telling the graphics designer how to draw them. The Neary case is art installation with glass. All of that is absolutely clear. The second point I want to make is recourse to the four corners doctrine under this assignment proves why the district court's decision was wrong. There's only one party here asking to go outside the four corners of the document, which say any and all. And that is the party asking to put a caret in there and insert the words except for past causes of action. Now I would like to turn to trade dress. Let's be really clear because we do this in the opening part of our brief. In 2004, Beatrice Ball launched her line. Her DBA at that time, her legal name was Fabulous Pewterware. Her doing business name, the way she presented the company to the public was Beatrice Ball Collection or Beatrice Ball. And it's been that way since 2004. I couldn't agree more with the remarks about the astute consumer. And it's not just me, it's other courts that have considered this issue when you're talking about this kind of market segment. The coach manufacturing decision, the Levi jeans. What specific type of stitching is like what specific type of decoration appear on Beatrice Ball bowls, the organic pearl bowls. And we come to whether or not people recognize the ultimate question here is secondary meaning. We have the canard that there is no evidence in this record about consumer recognition will not withstand review. First off, we have actual confusion. You can't be confused between Beatrice Ball and Pampa Bay unless you recognize Beatrice Ball in the first place. We have testimony about people at marketplaces where people come in the store and they ask what's new or they come at the market. This is Dallas or Atlanta. They ask what's new in organic pearl. How does the evidence that was submitted in the district court reinforce the idea that someone is going to recognize this design as Beatrice Ball? That's secondary meaning. I was proud to walk into the courtroom with the evidence that we had. Long-time sales, not a fashion designer who was knocked off in six days. Half a million dollars in advertising with testimony detailing how the pictures and there are many ads of just organic pearl highlight the design features here. The shape, the form, the texture, the beading that is used. We have media references where you want a pretty Thanksgiving table, this is what you put on there. Organic pearl or whatever the name of the product was. The specific bowl, this is a petite bowl. Did the advertising highlight the design features? I don't have the record citations right here. In our brief, I say David Rive, the general manager, spent pages of testimony describing how the photography used, highlighted the design features, how that was worked into some of the text. We're not advertising roadside signs to construction companies. It just seems to me it's something where this was tried. Sure, I think the judge probably could have gone your way on that factor, but the question is, was it clear for her to go this way? Did you get the question or answer the question from Judge Jones about how if you get reversed on the copyright standing issue, what the substance of the copyright claim would look like on remand versus all these trade dress issues? The substance of the copyright claim looks like the four certificates of registration we have. And another set of registrations that were refused. And you are allowed to challenge that refusal as part of the copyright claim. That's section 411A of the Copyright Act. But the vast majority of the beauty of the product design and the beauty of trade dress, is it stops all the imitation of people who have your elements. You don't have to advertise the product in terms of your unique elements when they're visually apparent, do you? I think that's correct. And I think that's especially true when you're advertising to people who sell design. People in jewelry stores, that's what they're into. They sell design. They recognize Beatrice Ball. So why is advertising a factor? If the advertiser just said in words, Beatrice Ball, how does that show that the design is what generates the consumer association? Because that's the design that Beatrice Ball inaugurated. There isn't a design. When the district judge... Correct. And the advertisements that were found deficient by the district court's logic, have a picture of an item like this and the word Beatrice Ball. I didn't submit advertisements that just say Beatrice Ball or Beatrice... I didn't respond to Judge Jones. I thought she was saying as long as the consumer happens to know what it looks like, it doesn't matter if the ad... And I thought the whole point of the advertising factor is it should show the design.  That is my inelegant expression of my views. You better say that as you get ready for private practice. Sorry. Thank you. We cannot accept gifts. Fake or real.